Cooke v. Watson.

WATTS COOKE, receiver, &c.,

v.

WILLIAM G. WATSON and others.

Lands owned by a partnership were sold to a corporation consisting mainly of the partners. No deed was executed, but possession was taken and improvements made by the corporation. In a suit by a receiver of the corporation to compel a formal conveyance for the benefit of the creditors,—*Held*,

(1) That a mortgage on the premises, duly authorized by the corporation, but in fact executed by the former owners (the money derived therefrom was in fact expended by and for the benefit of the corporation), was an encumbrance thereon from the date of its execution.

(2) That a mortgage given by the corporation (before the conveyance) was also an encumbrance.

(3) That a judgment recovered against one of the partners, after the premises had been sold to the corporation and possession openly taken by it, was not, in equity, a lien thereon.

(4) That although in ordering the partners to execute a formal conveyance, the wife of one, entitled to dower, could not be compelled to join therein, yet her husband, having received a full consideration and being bound to give a title clear of encumbrance, might be decreed to indemnify the corporation against her claim, unless she voluntarily relinquishes it.

Bill for relief. On final hearing on pleadings and proofs.

*Mr. A. B. Woodruff*, for complainant.

*Mr. H. A. Williams* and *Mr. W. Pennington*, for First National Bank of Paterson.

*Mr. Frelinghuysen*, for Equitable Life Assurance Society.

*Mr. J. C. Paulison*, for Westray & Gibbs, judgment creditors of W. G. Watson.

THE CHANCELLOR.

The Watson Manufacturing Company, a corporation under the laws of the state, and located at Paterson, was organized about the 1st of April, 1866. William G. Watson and James Watson were its principal stockholders. Of the 5,682 shares of its stock which were subscribed for, each owned 2,800. They had been, previously to the organization of the company, and up to that time, carrying on together, as partners, under the firm name of W. G. & J. Watson, the business for which the corporation was created, on premises in Paterson owned by them. Each paid for his share of the stock the amount of the par value thereof, $144,000, by a duly accepted draft upon the firm of W. G. & J. Watson, which was received by the corporation in payment of the price of the shares. The firm of W. G. & J. Watson ceased to do business after the organization of the company. At a special meeting of the board of directors of the company, held July 28th, 1866, at which both of the Watsons were present, a resolution was unanimously passed empowering the president (William G. Watson) to purchase the establishment, including the real estate, book debts &c. of the firm of W. G. & J. Watson, on behalf of the company, for the sum of $300,000. Under and by virtue of this resolution the company, through William G. Watson, its president, immediately afterwards purchased the property of the firm. It included three tracts of land in Paterson, one being lots numbers 16, 17, 18, 19, 20 and 23, in block N of map H of the Society for Establishing Useful Manufactures; another being three hundred and twenty-five feet front on Dale avenue, with the same front on Railroad avenue, and two hundred feet deep, and the other, consisting of four lots, immediately adjoining that tract on the southerly side.

Of those lots two were on Dale avenue and two on Railroad avenue, and they were numbered 14, 15, 26 and 27. The entire establishment, real estate, book debts &c., was valued and sold to the company at the price of $295,157.02, of which $200,000, or about that sum, was the price of the real estate. The Watsons were each, on or about the 31st of May, 1866, credited on the books of the company with the sum of $147,578.51, for and in payment of one-half of the price of the establishment so sold to and bought by the company. They immediately thereupon delivered possession of the establishment, including the real estate, to the company, which had possession of it as owner from that time up to the time (June 15th, 1876,) when the complainant was appointed receiver for its creditors and stockholders, by this court, under proceedings in insolvency.

Two fires occurred on the premises, one in 1873 and the other in 1875. At the first, all the buildings were burnt down; they were rebuilt by the company. At the other, very considerable damage was done to the buildings, which was repaired by the company. The buildings were very extensive and costly. When the first fire occurred (and, for aught that appears, when the last took place, also) the buildings were insured in the name of the company and as its property. On the 20th of April, 1869, the company being desirous of borrowing money—$25,000 to be used in building on the property—the board of directors adopted a preamble and resolution, stating that the company was about to obtain a loan from the Equitable Life Assurance Society of New York for $25,000, and authorizing the president to execute, in the name of the company, a bond and mortgage to secure that amount, with interest, on the land of the company. The land which it was proposed to mortgage to the life assurance society, under the resolution, was the tract before mentioned of three hundred and twenty-five feet front on Dale avenue, with like front on Railroad avenue. It was then discovered that the company either never had had any deed for that property from the Watsons, or, if one had

been made, it had not been recorded and could not be found. The Watsons, therefore, with the wife of William (James was then a widower), executed a mortgage on that property to the life assurance society, to secure the $25,000 and interest, for which the Watsons gave their bond. The mortgage is dated on the 1st of April, 1869, and was recorded on the 29th of that month. The principal of it is still unpaid. The money borrowed on the security of the bond and mortgage went into the treasury of the company, and was expended in building on the property.

On the 5th of December, 1871, the company being desirous of borrowing $10,000 of the trust funds held by this court on security of mortgage of the above-mentioned lots, numbers 14, 15, 16, 17, 18, 19, 20, 23, 26 and 27, those lots were, by deed of that date executed by the Watsons and their wives (James had then married again), conveyed in fee to the company, and the company afterwards, on the 24th of May, 1872, executed to the chancellor, to secure the payment of $10,000 and interest, its bond and a mortgage on the property so conveyed. The principal of that mortgage also is still unpaid.

On the 1st of June, 1874, the company mortgaged to the First National Bank of Paterson the whole of the property to secure the payment of $24,103.02, according to the tenor and effect of a promissory note of the company of that date for that sum, payable three months after date, to the order of the Watsons, by whom it was endorsed. That note fell due on the 4th of September following, and a check for the amount of it was then drawn by the company upon the mortgagee, with which the company kept its bank account and transacted its bank business. The check is in the hands of the receiver, bearing upon it the mark of having been paid by the mortgagee, and the amount of it was charged against the company and credited to the bank on the books of the latter. The body of it is as follows:

"Pay the mortgage note of Wm. G. and James Watson twenty-four thousand one hundred and three 02-100 dollars."

The note was not delivered up, however, but was retained and is still held by the bank. The bank insists that $20,000 of the principal of the note is unpaid, with interest from June 19th, 1876. On the 10th of August, 1876, Fletcher Westray and Alfred H. Gibbs recovered a judgment in the supreme court of this state against Edward J. Watson, William R. Edwards and William G. Watson, for $684.97, the greater part of which is, as they allege, unpaid. On the 19th of the same month the National State Bank at Newark recovered judgment in the same court against the North Belleville Quarry Company and William G. Watson for $1,908.19. No levy was made on any of the lands before mentioned, on either of those judgments.

The complainant, by his bill, prays that the Watsons and their wives may be decreed to convey the land mortgaged to the life assurance society to the company, as of the date of May 31st, 1866, which is prior to the date of that mort-. gage, or as of such other day as to the court may seem proper; that the liens thereon, if any, may be settled by this court, and the complainant decreed to hold the property subject only thereto; that the Watsons and their wives may be decreed to perform specifically the agreement for the sale of that land, and give legal effect to the sale thereof to and the purchase by the company, in such manner and on such conditions and subject to such liens and encumbrances as to this court may seem proper. And that the land may be declared to be free from all other liens or encumbrances of or in favor of the defendants or either of them. The First National Bank of Paterson had, when this suit was begun, brought an action, which was then pending in the supreme court, against the Watsons as endorsers on the note. The bill prays an injunction against the bank, restraining it from proceeding therein, on the ground that the note was paid by the check before mentioned. It also prays an injunction against all the defendants to prevent them from conveying away or encumbering the land in

question.   The life assurance society, the bank, and West-ray & Gibbs answered, but none of the other defendants.

It is established by the proof that the company purchased from the Watsons the property in respect to which this suit is brought, and paid them the purchase-money, and that, from the time of the purchase up to the time when the receiver was appointed, it was in full, open and notorious possession of it as owner.   It appears probable that no deed was ever given for it to the company.   The Watsons both say that they did not suppose that a deed was necessary to the transfer of the property from them to the company, and that they supposed that whatever papers were necessary for the transfer had been executed.   If no deed was executed it was merely through oversight.   On the payment of the purchase-money to them, the equitable title to the property passed to the company, and they were merely trustees of the legal title for it.   They neither have nor have they ever claimed to have any equitable title to the property since the sale, but on the other hand have always since then recognized the company as the owner.   They therefore will be decreed to convey it to the company, but their deed will not be decreed to take effect as against the mortgage of the life assurance society at a day anterior to the date of that mortgage.   That mortgage is a valid encumbrance upon the property in the hands of the company.   Not only did the company negotiate the loan, but it agreed to secure the payment of it by mortgage on this property, and instructed William G. Watson, its president, to execute such mortgage accordingly.   The mortgage was not executed by the company, but by those who were its trustees of the legal title. And, moreover, it is proved that the company received the money borrowed and expended it in building upon its property.   The life assurance society, by its mortgage, has the pledge of the legal title as security for the payment of its debt and interest.   There is no ground for disturbing or injuriously affecting it.   The society is entitled to the protection of equity.   Although as to the property mortgaged

to the life assurance society, the bank has the mortgage of the holders of the equitable title merely (for the legal title was, when that mortgage was made, in the Watsons, and the mortgage was executed, not by them, but by the company), the mortgage of the bank is valid and effectual as between the mortgagor and mortgagee, to pledge the equitable title of the former. *Sinclair* v. *Armitage*, 1 *Beas.* 174.

But it is insisted on the part of the complainant, that that mortgage, if originally valid, has no validity now because it has in fact been satisfied. By the terms of its proviso it was made to secure the payment of the note therein mentioned. The complainant insists that the note was paid by the check before mentioned, given by the company for the amount of the note, on the 4th of September, 1874, and which, as before stated, appears to have been marked by the bank as having been paid by it. The evidence is clear that only part of the amount of the note was paid, and that there still remains due upon it the sum of $20,000, with interest from June 19th, 1876. The check was given for the purpose of "taking the note out of the account on the books of the bank," as one of the bank officers expresses it. That is, it was given to answer to the amount of the note on the books of the bank, in order that on the books it might appear (but only appear) to pay the note. The money for the payment of the check was derived from the discount of two other notes given by the company in renewal of that note, and the debt was as much unpaid after the check was given as it was before. Moreover, it was understood and agreed between the company and the bank that the note was still to be held by the latter as evidence of the debt, and that renewals should from time to time be made, and the original note, except so far as it might be paid by paying the notes given in renewal or by other actual payments, was still to stand as evidence of the debt secured by the mortgage. Such an arrangement was valid and effectual, and will uphold the mortgage security until the debt shall have been in fact fully paid. *Robinson* v. *Urquhart*, 1 *Beas.* 515;

*Freeholders of Middlesex* v. *Thomas*, 5 *C. E. Gr.* 39; *Teed* v. *Carruthers*, 2 *Y. & C.* 30.

Of the judgment creditors only Westray & Gibbs have answered. They insist that their judgment is a lien on the premises in question, and that no conveyance should be ordered, to the prejudice of their lien. It is worthy of remark that it does not appear, and they do not allege, that they gave credit to William G. Watson on account of his supposed ownership of the property. The company was in open and notorious possession of the property, and had paid all the purchase-money, when their debt was contracted, which was in December, 1874, and William G. Watson was not in possession of any part of the property at that time, though he and his son had occupied part of it under the company prior to October, 1873. The possession of the company was notice to Westray & Gibbs of its claim of title. *Baldwin* v. *Johnson*, Sax. 441; *Bliss* v. *Havens*, 11 *C. E. Gr.* 363; *Johns* v. *Norris*, 12 *C. E. Gr.* 485, 487, 488.

At law a judgment is a general lien upon all the legal interest of the debtor in his real estate, but in chancery that general lien is controlled by equity so as to protect the rights of those who are entitled to an equitable interest in the lands or in the proceeds thereof. *White* v. *Carpenter*, 2 *Paige* 217, 267.

Westray & Gibbs's claim of lien cannot prevail against the equity of the company. The wife of James Watson has no claim to dower in the property. The property was sold by her husband and the purchase-money paid and possession given to the purchaser before her marriage. 1 *Scribner on Dower* 564. The wife of William G. Watson has a claim of inchoate dower in this property, but only in the equity of redemption. She was his wife when the contract for sale was made, but she signed and duly acknowledged the mortgage to the life assurance society with her husband. There will be a decree for specific performance, in accordance with the views which I have expressed, against William G. Watson and James Watson. No decree will be made against

the wife of the former (*Reilly* v. *Smith*, 10 *C. E. Gr.* 538), but her husband will, under the circumstances, be decreed to indemnify the company against her claim, unless she voluntarily relinquishes it.

The injunction against the bank and the life assurance society will be dissolved. That issued against the Watsons and their wives, and Westray & Gibbs, and the State Bank at Newark, will, as to all of them, except the wife of William G. Watson, be made perpetual.

The life assurance society and the Paterson bank are entitled to costs out of the funds in the hands of the complainant as receiver. No costs are awarded to or against Westray & Gibbs or the Newark bank. The complainant is entitled to costs as against William G. and James Watson.